UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| **NAFTOMAR SHIPPING AND TRADING CO. LTD.**, *et al*, | § § § § § | |
| **Plaintiffs**, | § § | |
| v. | § § | **CIVIL ACTION NO. V-11-2** |
| **KMA INTERNATIONAL S.A.**, *et al*, | § § § § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION & ORDER

Pending before the Court is Defendant Mauvelous Shipping S.A.'s ("Mauvelous") Supplemental Motion for Order to Show Cause as to Why Attachment of M/V PRETTY LADY Should Not be Vacated (Dkt. No. 29). Plaintiffs Naftomar Shipping and Trading Co., LTD ("Naftomar") and Liquid Petroleum Gaz Shipping Co., S.A. ("Liquid Petroleum") (collectively "Plaintiffs") have responded, and the Parties have filed memoranda and evidentiary submissions in support of their respective positions. (Dkt. Nos. 30—33.) Having considered the motion, response, arguments of counsel, evidence on record, and applicable law, the Court is of the opinion that Mauvelous' motion to vacate the attachment of PRETTY LADY should be **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

According to the facts as set forth in Plaintiffs' Original Verified Complaint (Dkt. No. 1), on or about October 16, 2008, Naftomar, on behalf of Liquid Petroleum, entered into a charter party agreement with Defendant KMA International S.A. ("KMA") for a 10-year charter of a vessel that was under construction at that time ("Time Charter Party"). The vessel, owned by Liquid Petroleum, was eventually named LPG/C GAZ EXPLORER. Naftomar delivered GAZ

1

EXPLORER to KMA on November 17, 2010, after construction was complete. On or about November 25, 2010, while GAZ EXPLORER was sailing to Singapore per KMA's instructions, KMA unilaterally cancelled the charter party. Naftomar responded with a message referring to KMA's repudiatory breach of the charter party and reserving all rights to claim for costs and damages caused by KMA's breach. The Complaint alleges $11,370,892.30 in damages.

On January 13, 2011, pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Supplemental Rule B"), Plaintiffs moved for the issuance of a Process of Maritime Attachment and Garnishment directing the United States Marshal to attach and seize PRETTY LADY, a liquid gas petroleum tanker. (Dkt. No. 2.) According to Plaintiffs, KMA is the true and beneficial owner of PRETTY LADY, and the vessel's registered owner, Defendant Mauvelous, is merely an alter ego of KMA. The following day, the Court granted Plaintiffs' motion and ordered PRETTY LADY seized. (Dkt. No. 3.)

On January 25, 2011, Mauvelous moved to vacate the attachment of PRETTY LADY on the grounds that Mauvelous was not a party to the Time Charter Party that Plaintiffs claim KMA breached, and Mauvelous is not a sham corporation or alter ego of KMA. (Dkt. No. 14.) Two days later, on January 27, 2011, the Court conducted an evidentiary hearing pursuant to Supplemental Admiralty and Maritime Claims Rule E(4)(f) ("Supplemental Rule E(4)(f)"). Following the hearing, the Court entered an order denying Mauvelous' motion to vacate attachment and granting Plaintiffs' request for leave to depose Mr. Athanassios Kossidas ("Kossidas") and conduct additional discovery related to the issue of alter ego. The Court also granted Plaintiffs' oral request for leave to file an amended complaint in order to adequately plead their alter-ego theory.

Plaintiffs filed their Verified Amended Complaint on February 3, 2011 (Dkt. No. 20), and in the week following the hearing, counsel for both parties traveled to Athens, Greece, where Kossidas was deposed. Mauvelous then reurged its motion vacate the attachment of PRETTY LADY and further moved the Court to dismiss the entire suit on *forum non conveniens* grounds. (Dkt. No. 30.) On February 25, 2011, the Court conducted a second evidentiary hearing pursuant to Supplemental Rule E(4)(f).

## II. MAUVELOUS' MOTION TO VACATE ATTACHMENT

### A. Legal Standard

In addition to meeting the filing and service requirements of Supplemental Rules B and E, in order to support the attachment of a defendant's property, the plaintiff must show that: (1) the plaintiff has a valid *prima facie* admiralty claim against the defendant; (2) the defendant cannot be found within the district; (3) the defendant's property may be found within the district; and (4) there is no statutory or maritime law bar to the attachment. *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 (2d Cir. 2006) (abrogated on other grounds by *Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58 (2d Cir. 2009)). *Id.*[1] Once a defendant's property has been attached, the defendant can move to vacate the attachment under Rule E(4)(f), and "a district court must vacate an attachment if the plaintiff fails to sustain his burden of showing that he has satisfied the requirements of Rules B and E."

Both before and after the *Aqua Stoli* decision, courts have disagreed as to the proper standard for determining whether a plaintiff has a valid prima facie admiralty claim for purposes

---

1. The Court, like the court in *Anchor Marine*, "notes the Second Circuit decision in *Aqua Stoli* is not binding on this Court." *Anchor Marine Transp. Ltd. v. LONESTAR 203*, 2009 WL 783395, *1 n.1 (W.D. La. Mar. 18, 2009). Still, "the decision is notable for its tracing of the history of maritime attachments under Rule B. Furthermore, this Court notes the long history of maritime attachments in the courts of the Second Circuit due to the commercial importance of the ports of New York. Therefore, this Court finds the *Aqua Stoli* decision helpful to this Court's determination of the issues in this case." *Id.*

3

of a motion to vacate under Rule E, and the Second Circuit has thus far declined to resolve this discord. *Transportes Navieros y Terrestres S.A. de C.V. v. Fairmount Heavy Transport, N.V.*, 572 F.3d 96, 103 n.2 (2d Cir. 2009) ("[T]his Court has not yet decided what type of showing a plaintiff must make to make out a prima facie admiralty claim. . . . We need not address this point in this case."); *see also Budisukma Permai SDN BHD v. N.M.K. Products & Agencies Lanka (Private) Ltd.*, 606 F. Supp. 2d 391, 398 (S.D.N.Y. 2009) (citing cases); *Emeraldian Ltd. Partnership v. Wellmix Shipping Ltd.*, 2009 WL 3076094, *3 (S.D.N.Y., Sept. 28, 2009). "Specifically, there is some debate as to whether the prima facie standard is purely a pleading standard, or whether it also incorporates an evidentiary requirement that there be 'reasonable grounds' for believing that the conditions for attachment exist." *Emeraldian*, 2009 WL 3076094, *3. "[C]ourts have compared the showing required in a 'reasonable grounds' analysis to the more familiar standard of probable cause," *Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd.*, 475 F. Supp.2d 275, 278—79 (S.D.N.Y. 2006) (internal citation omitted) (citing *Amstar Corp. v. S/S ALEXANDROS T.*, 664 F.2d 904, 912 (4th Cir. 1981); *Draper v. United States*, 358 U.S. 307, 311 (1959)).[2]

In deciding whether to apply the pleading standard or the reasonable grounds standard to the present case, the Court finds Judge Vance's opinion in *A. Coker & Co., LTD. v. Nat'l Shipping Agency Corp., et al.*, 1999 WL 311941, *1 (E.D. La., May 17, 1999) to be persuasive. In *A. Coker*, the court followed the reasonable grounds/probable cause standard, finding that "[a]t a post-arrest hearing, the plaintiff has the burden to establish probable cause for the arrest." *Id.* (citing *Continental Ins. Co. v. Adriatic Tankers Shipping Co.*, 1995 WL 649942 (E.D. La. 1995); *20th Century Fox Film Corp. v. M.V. Ship Agencies, Inc.*, 992 F. Supp. 1423, 1427 (M.D.

---

2. Probable cause is less than a preponderance of the evidence, and it has been described as a "fair probability" that the asserted fact is true. *Wajilam Exports*, 475 F. Supp.2d at 278—79 (citing *Illinois v. Gates,* 462 U.S. 213, 214 (1983)).

Fla. 1997). "The hearing is not intended to definitively resolve the dispute between the parties; rather, the Court must make a preliminary determination whether reasonable grounds exist for the arrest." *Id.* (citing *Salazar v. Atlantic Sun*, 881 F.3d 73, 79—80 (3d Cir.1989); *20th Century Fox*, 992 F. Supp. at 1427). Thus, courts in Rule E(4)(f) hearings do not make binding determinations of fact, but are "'merely holding that it is *likely*' that alleged facts are true." *Wajilam Exports*, 475 F. Supp. 2d at 280 (quoting *North of England Protecting and Indem. Ass'n v. M/V Nara*, 1999 WL 33116416, at *2 (E.D. La. 1999)) (italics in *England Protecting*).

As the Court will explain below, even under the more stringent reasonable grounds/probable cause standard, the Court finds that reasonable grounds exist to support PRETTY LADY's continued attachment.

**B. Analysis**

Mauvelous argues that Plaintiffs do not have a valid *prima facie* admiralty claim against it because Mauvelous was not a signatory to the Time Charter Party.[3] Moreover, even if Plaintiffs have a valid *prima facie* admiralty claim against KMA—who did sign the Time Charter Party—Plaintiffs cannot show that KMA's property is located in the district, since PRETTY LADY is solely owned by Mauvelous. Plaintiffs have responded that PRETTY LADY is owned by KMA "either directly or indirectly through a web of corporations involved in the alleged ownership and management of the PRETTY LADY[,] all of which are in reality the alter

---

3. In a footnote in its motion to vacate, Mauvelous argues that federal admiralty jurisdiction is lacking because the underlying dispute between Plaintiffs and KMA is not maritime in nature, but is merely a contract to construct a vessel. Thus, Mauvelous argues that Plaintiffs cannot assert a *prima facie* admiralty claim against any of the defendants. "A Rule B maritime attachment is a remedy available only under a court's admiralty jurisdiction," and if the underlying dispute does not fall within the admiralty jurisdiction, the court must vacate the attachment. *Alphamate Commodity GMBH v. CHS Europe S.A.*, 627 F.3d 183, 186 (5th Cir. 2010) (citing FED. R. CIV. P. 9(h); FED. R. CIV. P. SUPP. R. A(1)(A)). As Plaintiffs point out, The GAZ EXPLORER time charter is in the standard Shelltime 3 form and contains all the usual charter party terms that one would expect to find in a time charter, such as duration of the charter (10 years), description of the vessel and what type of cargo she would carry, rate of hire, duties of the Master, etc. "A charter party is a classic example of a maritime contract." *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 (5th Cir. 1986). Thus, the Court finds that the contract between Plaintiffs and KMA is maritime in nature.

egos of KMA and KMA's sole owner, director[,] and president, Mr. Athansios Kossidas (herafter 'Kossidas')." (Dkt. No. 33 at 2.) According to Plaintiffs, Mauvelous is included in this web of corporations and is merely an alter ego of KMA.

**1. Ownership of PRETTY LADY**

Plaintiffs have presented the following evidence in support of their claim that KMA owns PRETTY LADY:

- the hearing testimony of Alekos Detsikas ("Detsikas") (the chartering manager of Naftomar), who stated that Kossidas told him on more than one occasion that KMA owned PRETTY LADY;

- the hearing testimony of Stella Marks (the broker for the Time Charter Party between KMA and Naftomar), who testified that Kossidas told her "he was KMA" and that he had purchased PRETTY LADY;

- a Ship Overview obtained from www.sea-web.com, which indicates that KMA is the "group owner" of PRETTY LADY (Dkt. No. 33, Ex. 11);

- the Memorandum of Agreement (MOA) for the purchase of PRETTY LADY, which listed KMA and Mauvelous as "buyers" (*Id.*, Ex. 3);

- a February 7, 2008 email from Kossidas to Marks, in which Kossidas states, "I have just signed the MOA on Happy Lady (Dkt. No. 30, Ex. 37);

- an October 24, 2007 email recap concerning the sale of PRETTY LADY, which designates "KMA or Nominee(s) guaranteed by KMA" as buyers (Dkt. No. 33, Ex. 1);

- a February 7, 2008, email from Lars Torum, a manager at the Bank of Ireland, to Kossidas, wherein Torum inquires as to who would be providing the equity for the purchase of M/V HAPPY LADY, and whether "[i]t is it just KMA and Mike or will you bring in other investors." (*Id.*, Ex. 2);

- an April 7, 2008 email from Kossidas to George Poularas, which reflects that KMA was taking a 2% "address commission" from the purchase of PRETTY LADY (*Id*, Ex. 4);[4]

---

[4]. Plaintiffs explain that the difference between an "address" commission and a "broker's" commission is that an "address" commission is paid directly to the owner or the charterer and not to an independent broker. Thus, if a ship owner or charterer declares an address commission as a result of a charter party fixture or a vessel sale, then the address commission would go directly to the owner or the charterer as opposed to a "brokerage commission,"

6

- the time charter party between Mauvelous and Othello Shipping Company S.A. ("Othello") for PRETTY LADY, which refers to Mauvelous and KMA as "owners" and states that KMA is the "guarantor" for Mauvelous in the charter party (*Id.*, Ex. 7);

- the First Preferred Marshall Islands Mortgage (*Id.*, Ex. 5 ¶10.1) and the Agency Trust Agreement relating to PRETTY LADY (*Id.*, Ex. 6 ¶ 32.1), both of which reflect that the address for service of process is KMA's London address;

- and a KMA company profile that Kossidas sent to another broker, which states that "after the involvement [of KMA] in Global Gas Ltd., it was decided to reinvest in more modern tonnage, namely the LPG/C Happy Lady,[5] which was going to be acquired with a charter back to the previous owner, Othello Shipping," and that "LPG/C 'Pretty Lady' was acquired in April 2008" (*Id.*, Ex. 10).

The Court recognizes that Mauvelous has offered the Marshall Islands Certificate of Ownership dated September 24, 2009, which indicates that Mauvelous is the registered owner of PRETTY LADY (Dkt. No. 30, Ex. 1). However, based on the allegations in Plaintiffs' Verified Amended Complaint as well as the evidence in the record, the Court finds that Plaintiffs have established reasonable grounds to believe that KMA is the actual and/or beneficial owner of PRETTY LADY. Plaintiffs have not definitively established this fact; however, at this preliminary stage, they need only show probable cause. *See A. Coker & Co., LTD. v. Nat'l Shipping Agency Corp., et al.*, 1999 WL 311941, *2 (E.D. La., May 17, 1999). Plaintiffs have met this burden.

### 2. Alter Ego Theory

The alter ego doctrine applies only if: "(1) the owner exercised complete control over the corporation with respect to the transaction at issue and (2) such control was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Bridas S.A.P.I.C. v. Government*

---

which would be paid to an independent broker outside of the ownership or charter interests. (Dkt. No. 33 at 4—5.) Plaintiffs contend that KMA took an "address commission" because it was the purchaser of PRETTY LADY.

5. PRETTY LADY was formerly known as HAPPY LADY under Othello's ownership.

*of Turkmenistan*, 345 F.3d 347, 359 (5th Cir. 2003). Thus, Plaintiffs must establish reasonable grounds to support a finding of KMA's dominion and control over Mauvelous as well as fraud in relation to the underlying transaction involving the fixture of the GAZ EXPLORER Time Charter Party.

### a. Dominion and Control

While adopting a totality of the circumstances test, the Fifth Circuit has developed a non-exhaustive list of factors to consider in determining whether one company exercises dominion and control over another, such that an alter ego relationship exists:

> (1) the parent and subsidiary have common stock ownership; (2) the parent and subsidiary have common directors or officers; (3) the parent and subsidiary have common business departments; (4) the parent and subsidiary file consolidated financial statements; (5) the parent finances the subsidiary; (6) the parent caused the incorporation of the subsidiary; (7) the subsidiary operated with grossly inadequate capital; (8) the parent pays salaries and other expenses of subsidiary; (9) the subsidiary receives no business except that given by the parent; (10) the parent uses the subsidiary's property as its own; (11) the daily operations of the two corporations are not kept separate; (12) the subsidiary does not observe corporate formalities.

*Oxford Capital Corp. v. U.S.*, 211 F.3d 280, 284 n.2 (5th Cir. 2000) (citing *Century Hotels*, 952 F.2d at 110 n.5 (5th Cir. 1992)).

"To state a prima facie claim for alter ego liability, plaintiffs must make specific factual allegations from which alter ego status can be inferred; conclusory allegations are insufficient." *Emeraldian Ltd. Partnership v. Wellmix Shipping Ltd.*, 2009 WL 3076094, *3 (S.D.N.Y., Sept. 28, 2009). Here, Plaintiffs' Verified Amended Complaint alleges the following facts in support of their claim that KMA exercises dominion and control over Mauvelous, such that an alter ego relationship exists: Mauvelous has or had no separate offices, officers, address, or telephone numbers from KMA (¶ 31); the costs to incorporate Mauvelous were paid by KMA (¶ 31); KMA and Mauvelous are situated at the same address at 4 Flitcroft St., London WC2H 8DH, England

(¶ 32); in an effort to frustrate creditors, KMA reorganized itself into Mauvelous and/or Aerio Holdings and/or Aerio Shipmanagement and/or N.A. Maritime (NAM) (collectively "Group Companies"), which carry out or direct the same business of KMA, *i.e.*, management, ownership, and charter of vessels (¶ 34); KMA and the Group Companies are operated, controlled, and managed as a single economic enterprise, which is ultimately controlled by Mr. Kossidas, a common and overlapping director, officer, manager, and shareholder (¶ 37); KMA, through Mr. Kossidas, exercised complete control over the Group Companies (¶ 38); and Plaintiffs cannot locate any substantive agreements involving KMA or any of the Group Companies that was signed by anyone other than Mr. Kossidas (¶ 39).

Plaintiffs have also presented the following evidence in support of their alter ego theory:

- the First Preferred Marshall Islands Mortgage (Dkt. No. 33, Ex. 5 ¶10.1) and the Agency Trust Agreement relating to PRETTY LADY (*Id.*, Ex. 6 ¶ 32.1), both of which reflect that the address for service of process for Mauvelous is in care of KMA at KMA's London address, supporting the conclusion that KMA and Mauvelous share a London office;

- a KMA business card Kossidas gave to Detsikas (*Id.*, Ex. 27) and bank payment records for Mauvelous (*Id.*, Ex. 28), both of which reflect an address on 21 Metaxa Street in Glyfada, Greece, supporting the conclusion that KMA and Mauvelous also shared an office in Greece;

- KMA's company profile, which indicates that one of the Group Companies, Aerio Shipmanagement, "was created by KMA's principals" (*Id.*, Ex. 9 at 4);

- Kossidas' deposition testimony that Mauvelous has had to reschedule three quarterly mortgage payments, Mauvelous still owes its "original investors" $3 million for loans made to Mauvelous, and Mauvelous owed another company $1 million in 2009 (Kossidas Dep. 117:1-5, 127:12-23), showing that Mauvelous operated with grossly inadequate capital;

- the Consolidated Financial Statements of Aerio Holdings indicating the capital payments of $520,000 that were due in July and October 2010 had not been paid as of the balance sheet date (Dkt. No. 30, Ex. 3 at 17), which further shows that Mauvelous operated with grossly inadequate capital;

9

- a KMA company profile Kossidas sent to a separate broker in June 2009 stating that "LPG/C 'Pretty Lady' was acquired in April 2008" (Dkt. No. 33, Ex. 10), which shows that KMA used Mauvelous' sole asset— PRETTY LADY—as its own;

- Kossidas' declaration that the Group Companies share all the same directors, including Kossidas, who is also a director of KMA (Kossidas Decl. ¶ 10);

- the Sale and Purchase Agreement related to NAM's purchase of Aerio Holdings and Aerio Shipmanagement, in which Kossidas signed on behalf of all three sellers, the assignor, and the purchaser NAM (Dkt. No. 33, Exs. 25 & 26), demonstrating that Kossidas is the only active manager or director of any Group Company; and

- the time charter party and MOA for PRETTY LADY in which KMA acted as a broker and still acts as a guarantor (*Id*, Exs. 3, 7), which show that KMA effectively finances and gives business to Mauvelous.

### b. Fraud in the Underlying Transaction

Plaintiffs' Verified Amended Complaint alleges the following facts in support of their claim that KMA used its control over Mauvelous to fraudulently induce them into entering into the Time Charter Party: KMA fraudulently represented its financial strength in order to induce Plaintiffs to enter into a charter party (¶¶ 30, 41); KMA made various representations, both verbally and through documentation, that it had the financial strength to perform under a 10-year charter party (¶ 11); and KMA repeatedly thwarted Plaintiffs' attempts to inquire into its financial strength by expressly stating to Plaintiffs and their broker that it owned three other vessels, namely ATHENS GAS, INGEGAS, and PRETTY LADY (¶¶ 12, 42, 43).

Plaintiffs have also offered the following evidence in support of their fraud allegations:

- Marks' February 25, 2011 hearing testimony that Kossidas deliberately misrepresented to her that KMA was the owner of PRETTY LADY on more than one occasion;

- Detsikas' February 25, 2011 hearing testimony that that Kossidas deliberately misrepresented to him that KMA was the owner of PRETTY LADY on more than one occasion;

- Detsikas' February 25, 2011 hearing testimony that, at the time Naftomar entered into the Time Charter Party with KMA, Naftomar was under the false impression—created by Kossidas and KMA—that KMA owned at least 3 vessels, including PRETTY LADY;

- the KMA company profile that Kossidas sent to another broker, which states that KMA was "decided to reinvest in more modern tonnage, namely the LPG/C Happy Lady, which was going to be acquired with a charter back to the previous owner, Othello Shipping," and that "LPG/C 'Pretty Lady' was acquired in April 2008." (Dkt. No. 33, Ex. 10);

- and Detsikas' February 25, 2011 hearing testimony that KMA's supposed ownership of these vessels gave Naftomar some financial assurance as to KMA's ability to perform under the GAZ EXPLORER charter, failing which, Naftomar would have potential access against the vessels for security of its claim.

The Court recognizes that Mauvelous has presented controverting evidence by way of shareholder declarations, certificates of incorporation, financial statements, and other documents, which create a fact issue on Plaintiffs' alter ego theory. However, based on the allegations in Plaintiffs' Verified Amended Complaint as well as the evidence in the record, the Court finds that Plaintiffs have presented reasonable grounds to believe that Mauvelous is the alter ego of KMA, and that KMA used its control over Mauvelous to fraudulently induce Plaintiffs into entering into the underlying time-charter party involving GAZ EXPLORER. Plaintiffs have not definitively established this fact; however, at this preliminary stage, they need only show probable cause. *See A. Coker*, 1999 WL 311941, *2. Plaintiffs have met this burden.

## IV. CONCLUSION

Plaintiffs have pled sufficient facts and offered sufficient evidence in support of their alter ego allegations to maintain PRETTY LADY's attachment at this stage of the proceedings. Accordingly, Mauvelous' motion to vacate the attachment of PRETTY LADY (Dkt. No. 29) is hereby **DENIED**.

However, it is possible that Plaintiffs will ultimately fail to prove that KMA and Mauvelous are alter egos, and the Court recognizes that "[a]n erroneous attachment of [property] is extremely burdensome on the compan[y] whose [property is] attached." *REA Navigation, Inc. v. World Wide Shipping Ltd.*, 2009 WL 3334794, *3 (S.D.N.Y., Oct. 14, 2009). Thus, in order to ensure that PRETTY LADY is not attached longer than necessary, the Court will hold an expedited trial on the merits of Plaintiffs' alter ego allegations as soon as the Parties have completed discovery on this issue.

It is so **ORDERED**.

**SIGNED** this 10th day of March, 2011.

_____
JOHN D. RAINEY
SENIOR U.S. DISTRICT JUDGE